UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------X
FRANK BRISCO,

                                    Petitioner,

                                                            **MEMORANDUM OF**
                    -against-                               **DECISION AND ORDER**
                                                            04-cv-00829 (ADS)

WILLIAM PHILLIPS,
Acting Superintendent of Green Haven
Correctional Facility,

                                    Defendant.
---------------------------------------------------X

**APPEARANCES**

**FRANK BRISCO**
Pro Se Petitioner
00-A-4331
Green Haven Correctional Facility
P. O. Box 4000
Stormville, NY 12582

**THOMAS J. SPOTA**
**DISTRICT ATTORNEY OF SUFFOLK COUNTY**
Arthur M. Cromarty Court Complex
200 Center Drive
Riverhead, NY 11901
        By:    Guy Arcidiacono, Assistant District Attorney

**SPATT, District Judge.**

        Frank Brisco ("Brisco" or the "Petitioner") petitions pro se pursuant to 28 U.S.C. §

2254 for a writ of habeas corpus.  The Petitioner seeks habeas corpus relief from his August

1, 2000 conviction in Supreme Court, Suffolk County, New York, for attempted burglary in

the second degree. Following a plea of guilty, the Petitioner was sentenced to an

indeterminate term of 12 years to life. The New York Appellate Division, Second

Department, and the New York Court of Appeals both affirmed the conviction with one

judge dissenting in each decision. See People v. Brisco, 99 N.Y.2d 596, 788 N.E.2d 611,

758 N.Y.S.2d 262 (2003); People v. Brisco, 292 A.D.2d 626, 741 N.Y.S.2d 50 (2d

Dep't 2002).

The sole challenge to the conviction that the Petitioner raises is whether the pre-trial

admission of an out-of-court "showup" identification violated his due process rights. For the

reasons that follow, the Court finds that the state court unreasonably applied Federal law in

admitting the pre-trial identification of the Petitioner, and therefore, the Court grants the writ

of habeas corpus.

## I. BACKGROUND

On July 6, 1999, at 11:30 a.m., Suffolk County Police Detective Brian McNeil

responded to a report of a burglary at a private house at 51 Mills Pond Road in St. James,

New York. Detective McNeil spoke with a fellow police officer and the complainant

Augusta Kemper, who was described as an "older women." Ms. Kemper provided a

description of the suspect as being a white male in his twenties, approximately 5'10" tall,

well-built, brown hair, wearing maroon shorts and no shirt. At approximately 11:50 a.m.,

Police Officers Brian Holtje and Thomas Bafundo responded to the radio report of the

burglary that included a similar description of the perpetrator. Officer Holtje recalled the

description as being that of a white male in his twenties with brown hair, red or maroonish

shorts, no shirt, and a stocky, muscular build. His partner recalled that the description of the

suspect was of a white male, no shirt, stocky build, 18 to 20 years old, brown hair, wearing

a pair of shorts, who was running up the street to the north.

Five minutes later, at approximately 11:55 a.m., Officers Holtje and Bafundo arrived

at the scene of the burglary and confirmed the description of the perpetrator with Detective

McNeil. Officers Holtje and Bafundo then "proceeded to drive around the neighborhood."

Between 1,000 and 1,500 feet to the north of the scene, they noticed a house at 66 Mills

Pond Road with the front door open. The house appeared to be under renovation due to

the presence of a dumpster and construction debris in the driveway. The two officers

approached the house, one going to the front and the other going to the back. Officer Holtje

approached the front and noticed that there was a closed door next to the open front door

and he knocked on the door. Officer Bafundo went to the back of the house where he

noticed a swimming pool and a man inside the house wrapping himself in a towel.

Officer Holtje knocked on the door a second time and a man wearing a towel

answered the door. The man identified himself as Frank Brisco and told the officers that the

house belonged to his sister and that he and his friend were renovating the bathroom.

Officer Holtje estimated Brisco to be approximately 30 years of age and stated that he did

not appear nervous. Brisco's date of birth is March 11, 1961, and in fact, he was 38 years old at the time of the incident. After this brief conversation, both officers returned to their patrol car and left the house.

Officer Holtje testified at the hearing that after leaving the house he found it suspicious that the Petitioner answered the door wearing only a towel while the bathroom was under renovation. At approximately 12:10 p.m., after contacting Detective McNeil, the two officers and the detective returned to the house where Brisco was previously seen.

The three officers knocked on the door and Brisco answered; this time wearing a pair of tan shorts and no shirt. Brisco invited the detective and the two officers into the kitchen. There was another person present in the house, named Brian McGraff, who was working in the bathroom. Apparently, the bathroom was under renovation and Brian's clothes were covered with dust and dirt. Detective McNeil described Brian as about 40 years old, with brown hair, 5'10" tall, and "pouchy." Officer Holtje described Brian as a white male in his twenties, with black hair and could not recall his build.

After being invited inside, Detective McNeil told Brisco that there had been a burglary in a house down the street. The Detective asked him where he had been that morning and Brisco replied that he had remained at his sister's house all morning. As the four men had a conversation in the kitchen, one of the officers noticed a wet pair of maroon shorts on the floor of an adjoining bedroom. He asked Brisco if the shorts were his and he

responded that they were his shorts.  Detective McNeil asked Brisco to go down the street

with the officers "to see if someone could recognize him [in] reference to the burglary."

According to Detective McNeil, Brisco agreed to go to the scene.  Detective McNeil took

the maroon shorts with him, without any objection from Brisco.  He was placed in the back

seat of the police car and driven to the scene of the burglary.

The detective, the two police officers, and Brisco returned to the crime scene at

approximately 12:25 p.m., slightly less than one hour after the officers received the initial

report.  Brisco exited the police car and stood at the bottom of the driveway, a distance

described at approximately 15 to 50 feet from the complainant's house.  Brisco was still

wearing tan shorts and was nude from the waist up and he was not handcuffed.  Detective

McNeil went inside the complainant's house and spoke with Ms. Kemper toward the back

of the house for approximately ten to fifteen minutes.  While the Petitioner waited in front of

the house, he allegedly stated to one of the police officers "Where is she?"  The officer

responded, "How do you know it's a she?"  There was no other conversation between the

Petitioner and the other officers while they waited in front of the house.

After ten to fifteen minutes elapsed, Detective McNeil came back outside and

retrieved the wet maroon shorts from the patrol car.  He asked Brisco to hold the wet shorts

and then went back into the house to speak with the complainant.  Brisco complied with the

request, holding the shorts in his hands at waist level, just next to his hip.  At this point there

were now three uniformed police officers standing in close proximity to Brisco as well as three police vehicles behind Brisco parked in front of the house. There were no other bystanders or persons in the street or in the vicinity.

After handing the shorts to Brisco, Detective McNeil went back into the house and brought Ms. Kemper to the front window of the house and asked her to look outside and state if she recognized anyone. According to the detective, the complainant identified Brisco as the perpetrator. He testified to the following:

Q      After giving the shorts to the defendant in the driveway of 51 Mills Pond Road, did you go back into the house?

A      Yes, I did.

Q      And what did you do at that time?

A      I had had [the complainant] look out the window of the house to see if she would recognize anyone.

Q      When you went back into the house, after giving the defendant the shorts from your car, was [the complainant] in the back of the house or the front?

A      Yes, she was. I went to the rear of the house and brought her to the front room.

Q      And what did you say to her when you brought her to the front room?

A      I asked her if she recognized anyone standing outside.

Q      Do you remember if the [complainant] said anything when she viewed the defendant at this time?

A       Yes, she looked at the subject standing outside, and she stated that this is the person that she saw leaving the house, and that he was the same height, color hair, build, and she also identified the shorts that he was holding.

Q       And she identified those shorts that he was holding as what?

A       As the shorts that she saw the individual wearing that was inside her house when the burglary occurred.

Tr. at 123–24.

After the identification, Brisco was asked to go to the precinct, where he was questioned and subsequently released.  Three days later, he was arrested.

A Wade hearing was held on March 28, 2000, in Suffolk County Supreme Court. After the hearing, Brisco's request to suppress the identification was denied on the grounds that: "(1) the showup was conducted promptly, within a short time after the commission of the crime; (2) it was conducted at the crime scene; (3) defendant was not singled out—in fact, he was not even in handcuffs; and (4) he was allowed to leave after the victim saw him. He was not arrested until three days later." Brisco, 292 A.D.2d at 629, 41 N.Y.S.2d at 53.

After the denial of the motion to suppress the showup, Brisco pled guilty to one count of attempted burglary and preserved his right to appeal the suppression ruling.  He was sentenced as a predicate violent offender to an indeterminate term of 12 years to life.

The Appellate Division affirmed the trial court's suppression ruling, holding that the identification was proper.  The court found the show-up was conducted in close temporal

and geographical proximity to the crime scene and rejected Brisco's argument that the act of holding the shorts during the identification was improper. Justice Gloria Goldstein dissented, stating that the identification was rendered grossly and unnecessarily suggestive when the police required the defendant to hold a pair of shorts which were the same distinctive color as the complainant claimed the perpetrator was wearing.

The New York Court of Appeals also upheld the trial court's ruling denying the motion to suppress the showup identification. The court noted that the show-up took place "at the scene of the crime, within an hour of the commission of the crime, and in the context of a continuous, ongoing, investigation." Brisco, 99 N.Y.2d at 597, 788 N.E.2d 611, 758 N.Y.S.2d 262. The court also stated that the complainant had initially and independently identified him relying on his height, hair color, and build. The court held that the holding of the shorts did not, by themselves, negate the reasonableness of the police action. One Judge dissented, claiming the show-up was unnecessary, untimely, and suggestive. Brisco then petitioned this court for habeas relief.

## II.    DISCUSSION

### A.    Exhaustion

In the interest of comity and in keeping with the requirements of 28 U.S.C. § 2254(b), federal courts will not consider a constitutional challenge that has not first been "fairly presented" to the state courts. See Ayala v. Speckard, 89 F.3d 91, 94 (2d Cir.

8

1996) (citing <u>Picard v. Connor</u>, 404 U.S. 270, 275, 30 L. Ed. 2d 438, 92 S. Ct. 509

(1971)).  Here, based on the record before the Court, it appears that the Petitioner has

exhausted his state court remedies.  The Petitioner presented his constitutional challenge to

the admission of the showup to all available state appellate courts and the state courts

adjudicated that claim on the merits.  <u>See</u> <u>Brisco</u>, 99 N.Y.2d at 596, 788 N.E.2d at 611,

758 N.Y.S.2d at 262; <u>Brisco</u>, 292 A.D.2d at 626, 741 N.Y.S.2d at 50.

      The Court notes that a guilty plea is no obstacle to this Court's collateral habeas

corpus review of a conviction that alleges constitutional infirmities in the pre-trial proceedings

when, as here, state law permits a defendant to appeal the results of such pre-trial

proceedings.  <u>See</u> <u>Lefkowitz v. Newsome</u>, 420 U.S. 283, 289, 95 S. Ct. 886, 889, 43 L.

Ed.2d 196 (1975); <u>Lloyd v. Walker</u>, 771 F. Supp. 570, 576 (E.D.N.Y. 1991); N.Y. Crim.

Proc. Law § 710.70(2).

### B.      Standard of Review of State Court Determinations

      The Antiterrorism and Effective Death Penalty Act (the "AEDPA") provides that a

federal court may grant habeas relief to state prisoners with respect to any claim that was

adjudicated on the merits in state court proceedings only if

> the adjudication of the claim—
>    (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme
> Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); See DeBerry v. Portuondo, 403 F.3d 57, 66 (2d Cir. 2005); Wade

v. Herbert, 391 F.3d 135, 140 (2d Cir. 2004). A state court's factual finding enjoys a

"presumption of correctness" that the petitioner must rebut by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

Accordingly in the first prong, the AEDPA directs a federal court to confine its

habeas review of a state court decision to whether the state-court decision was either: (1)

contrary to clearly established Federal law; or (2) involved an unreasonable application of

clearly established Federal law. The two standards are independent of each other. In the

second prong, the issue is whether the decision was based on an unreasonable determination

of the facts in light of the evidence presented in the state court proceeding.

With regard to the first prong, turning to the "contrary to" inquiry, "[a] state-court

decision is 'contrary' to clearly established federal law within the meaning of § 2254(d)(1) if

it is 'diametrically different' from, 'opposite in character or nature' to, or 'mutually opposed'

to the relevant Supreme Court precedent. Henry v. Poole, 409 F.3d 48, 68 (2d Cir. 2005)

(quoting Williams v. Taylor, 529 U.S. 362, 405, 120 S. Ct. 1495, 146 L. Ed. 2d 389

(2000) (quotations omitted)). Thus, if the state court applies a rule of law that contradicts a

law set forth by the Supreme Court, or if the state court confronts a set of facts that is

materially indistinguishable from a decision of the Supreme Court and reaches a different result, that decision is considered contrary to clearly established law. See Williams, 529 U.S. at 405–06, 120 S. Ct. 1495, 146 L. Ed. 2d 389.

The second standard of the first prong is not as clearly defined as the first. A state-court decision involves "an unreasonable application" of clearly established Federal law if the state court applies Federal law to the facts of the case in an objectively unreasonable manner. See Brown v. Payton, 125 S. Ct. 1432, 1438–39 (2005); Taylor, 529 U.S. at 405, 146 L. Ed. 2d 389, 120 S. Ct. 1495. It is "well-established" in the Second Circuit that the "objectively unreasonable" standard of § 2254(d)(1) means that the "petitioner must identify some increment of incorrectness beyond error in order to obtain habeas relief." Rosa v. McCray, 396 F.3d 210 (2d Cir. 2005) (quoting Cotto, 331 F.3d at 248).

The Second Circuit has explained that:

> an unreasonable application of federal law is different from an incorrect or erroneous application of federal law. Thus, a federal habeas court is not empowered to grant the writ when, in its independent judgment, it determines that the state court incorrectly applied the relevant federal law. The state court's application must reflect some additional increment of incorrectness such that it may be said to be unreasonable. However, the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence.

Lainfiesta v. Artuz, 253 F.3d 151, 155 (2d Cir. 2001).

As further explained in <u>Williams</u> by the Supreme Court:

> In sum, the statute directs federal courts to attend to every state-court judgment with utmost care, but it does not require them to defer to the opinion of every reasonable state-court judge on the content of federal law. If, after carefully weighing all the reasons for accepting a state-court's judgment a federal court is convinced that a prisoner's custody . . . violates the Constitution, that independent judgment should prevail. Otherwise the federal law as determined by the Supreme Court of the United States might be applied by the federal courts one way in Virginia and another way in California.

<u>Williams</u>, 529 U.S. at 389–90 (quotations omitted).

In sum, the Second Circuit "has concluded that an 'objectively unreasonable' application of Supreme Court precedent falls somewhere between 'merely erroneous and unreasonable to all reasonable jurists.' " <u>Henry</u>, 409 F.3d at 68 (quoting <u>Francis S. v. Stone</u>, 221 F.3d 100, 109 (2d Cir. 2000)). With these standards in mind, the Court will analyze the merits of the Petitioner's claim.

C.      **Showup Identifications and Due Process**

Brisco contends that he was denied his constitutionally guaranteed right to due process when the state-court judge failed to suppress a pretrial out-of-court, "showup," witness identification. A "showup," or "[t]he practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." <u>Stovall v. Denno</u>, 388 U.S. 293, 302, 87 S. Ct. 1967, 1972, 18 L. Ed.2d 1199 (1967). It has long been clearly established by the Supreme Court that a criminal defendant has the

right under the Due Process Clause of the Constitution not to be subjected to suggestive police identification procedures that create a "very substantial likelihood of irreparable misidentification." Manson v. Brathwaite, 432 U.S. 98, 116, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977); see also Raheem v. Kelly, 257 F.3d 122, 133 (2d Cir. 2001) ("Due process requires that criminal trials proceed consistently with that fundamental fairness which is essential to the very concept of justice.").

The admissibility of a pretrial identification is governed by the clearly established standards set forth by the Supreme Court in Manson, 432 U.S. at 116, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977), Neil v. Biggers, 409 U.S. 188, 198, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972), and Stovall, 388 U.S. at 302, 87 S. Ct. 1967, 18 L. Ed. 2d 1199 (1967). See, e.g., Kennaugh v. Miller, 289 F.3d 36, 43 (2d Cir. 2002); Raheem, 257 F.3d at 133; Wray v. Johnson, 202 F.3d 515, 526 (2d Cir. 2000); Vasquez v. Poole, 331 F. Supp. 2d 145, 149 (E.D.N.Y. 2004). This trilogy of Supreme Court precedent instructs that in order to determine whether the identification is admissible, a court must undertake a two step inquiry. First, the court must determine "whether the pretrial identification procedures unduly and unnecessarily suggested that the defendant was the perpetrator." Raheem, 257 F.3d at 133. If the court finds that the procedures were not suggestive, "the identification evidence presents no due process obstacle to admissibility." Id. However, if the court finds

that the procedures were suggestive, "it must then determine whether the identification was nonetheless independently reliable." Id.

**D.    Suggestiveness**

The first part of the test involves whether the identification were unnecessarily suggestive. Quoting the Supreme Court, the Second Circuit has stated that "[a] major factor contributing to the high incidence of miscarriage of justice from mistaken identification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification." Id. (quoting United States v. Wade, 388 U.S. 218, 228, 87 S. Ct. 1926; 18 L. Ed. 2d 1149 (1967)). The "showup" has been characterized by an authoritative text as "the most grossly suggestive identification procedure now or ever used by the police." Wayne R. LaFave et. al., Criminal Procedure § 7.4(f) (2d ed. 1999). This "scholarly concern" and the "judicial remedies" that have developed are fueled by "the notorious inaccuracy of eyewitness identifications of suspects . . . ." Johnson v. Ross, 955 F.2d 178, 180–81 (2d Cir. 1992).

The Supreme Court has held that an identification procedure is suggestive where it "in effect . . . says to the witness 'This is the man.' " Foster v. California, 394 U.S. 440, 443, 89 S. Ct. 1127, 22 L. Ed. 2d 402 (1969) (emphasis in original) (quoting Biggers v. Tennessee, 390 U.S. 404, 407, 88 S. Ct. 979; 19 L. Ed. 2d 1267 (1968)). Thus, a showup, as opposed to a lineup or photo array is "inherently suggestive," due to the fact that

the defendant is presented singly to the witness by the police.  Brodnicki v. City of Omaha,

75 F.3d 1261, 1265 (8th Cir. 1996).  Notwithstanding the inherent suggestiveness, it has

long been determined that a showup violates due process only if it is the product of an

"unnecessarily suggestive" procedure.  United States v. Bautista, 23 F.3d 726, 729–30 (2d

Cir. 1994).

      A factor in determining whether a showup is the product of an unnecessarily

suggestive procedure is the existence of exigent circumstances, which may necessitate its use

to quickly confirm the identity of a suspect.  See United States v. Valez, 796 F.2d 24, 27

(2d Cir. 1986).  Quick identification permits the release of a wrongly detained suspect and

allows the police to continue the search for the suspect who may still be at large.  See,

e.g.,United States ex rel. Cummings v. Zelker, 455 F.2d 714, 716 (2d Cir. 1972) (holding

that the showup was necessary to insure "the immediate release of an innocent suspect and

at the same time enable the police to resume the search for the fleeing culprit while the trail is

fresh").  For this reason, courts have consistently admitted showups that are held in close

temporal and geographic proximity to the crime.  See, e.g., United States v. Butler, 970

F.2d 1017, 1021 (2d Cir. 1992).

      On the other hand, unnecessary words or actions that aggravate the inherent

suggestiveness of a showup may render it inadmissible.  "Identification evidence must be

suppressed if the display was 'so unnecessarily suggestive and conducive to irreparable

mistaken identification that the defendant was denied due process of law.' " United States

v. Jakobetz, 955 F.2d 786, 803 (2d Cir. 1992) (quoting Stovall, 388 U.S. 293 at 302, 87

S. Ct. 1967, 18 L. Ed. 2d 1199 (1967)). Examples of especially suggestive showups

generally include instances where the suspect is unnecessarily singled out by police action.

See, e.g., Wray, 202 F.3at 520–21 (confirming that the showup identification of a suspect

matching the description of having a black hat and long black coat while in a jail cell was

improperly suggestive); Dunnigan v. Keane, 137 F.3d 117, 129 (2d Cir. 1998) (finding it

"highly suggestive" when a victim of a robbery was shown several pictures from ATM

security cameras of only one individual); United States v. Mohammed, 27 F.3d 815, 821

(2d Cir. 1994) (finding a showup suggestive where the witness identified the gun used in the

crime and then the defendant, who at the time was handcuffed in the back seat of a police

car); Patterson v. LeMaster, 130 N.M. 179, 184 (2001) (finding the showup identification

especially suggestive because the police spotlighted petitioner with the headlights of a police

vehicle during the identification); People v. Adams, 53 N.Y.2d 241, 440 N.Y.S.2d 902

(1981) (noting that a showup was suggestive where before the viewing, a police officer

informed the victim that he thought they had the robbers, and the showup was conducted in

the station house while the defendants were standing with their hands behind their backs and

a police officer behind each defendant).

As stated in <u>People v. Riley</u>, 70 N.Y.2d 523, 530, 522 N.Y.S.2d 842 (1987), in which two separate convictions were reversed because of suggestive showups, the New York Court of Appeals stated:

> The importance of identification evidence is, of course, self-evident. But then so, too, are the weaknesses and dangers of improper identification evidence. "The influence of improper suggestion upon identifying witnesses probably accounts for more miscarriages of justice than any other factor -- perhaps it is responsible for more such errors than all other factors combined." The complex psychological interplay and dependency of erroneously induced identification evidence via showups, lineups, various bolsterings and the like must be vigilantly guarded against because this kind of error drives right into the heart of the adjudicative guilt or innocence process affecting the person accused and identified. Thus, constitutional, statutory and decisional safeguards have been erected essentially to insure reliability of this most potent evidence.

<u>Id.</u>, 70 N.Y.2d at 530–31, 522 N.Y.S.2d 842 (citations omitted).

It is interesting to note that in the two showups in <u>Riley</u> held to be both suggestive, neither victim testified at the Wade hearing. Here, the victim who made the identification did not testify and no reason was given for her failure to be called.

In this case the Court finds that the showup was impermissibly suggestive. As a preface, it appears that under the circumstances the use of a showup instead of a lineup was not necessary. The Petitioner was found almost a half hour after the crime just down the street in his sister's house. There was time for the culprit to have long fled the area. The burglary occurred more than an hour prior to the showup. The Petitioner was the only person that the police suspected at the time and was totally cooperative. The burglary

occurred in the middle of the day. Considering these circumstances, it appears that the police could have easily constructed a less suggestive lineup at the police station within a short period of time rather than conducting a showup.

The showup itself was highly suggestive. The Petitioner was shown to the victim while he was nude from the waist up and surrounded by three uniformed policeman and two marked and one unmarked police vehicles. There were no other individuals in the immediate area other than uniformed police officers. In addition, he was told by the Detective to hold a wet pair of maroon shorts that fit the distinctive description of the perpetrator's clothing that the victim gave the police. Indeed, the Detective testified that the victim specifically stated that the shorts Brisco was holding were the shorts that the culprit was wearing at the time of the burglary. Plainly, the presence of the maroon shorts held in his hands at waist level, just below his hip, had to influence the victim in making the identification. In her original description she stated that the perpetrator was wearing maroon shorts. And, in the showup, there he was holding maroon shorts. All of these circumstances "essentially rendered the defendant a bull's eye" and said to the witness "this is the man." Brisco, 99 N.Y.2d at 602, 788 N.E.2d 611, 758 N.Y.S.2d 262 (Smith, J., dissenting); see also Brisco, 292 A.D.2d at 629, 741 N.Y.S.2d 50 (Goldstein, J., dissenting) ("There was no reason for him to hold the shorts, other than to single him out as the perpetrator."). This act of compelling the Petitioner to hold up maroon shorts in front of him as he stood there in

the company of three uniformed police officers could only have been designed to insure a positive identification.

Having found that the showup was impermissibly suggestive, due process requires that the identification only be admitted if a threshold level of reliability can be established independent of the suggestive procedure to cure the suggestiveness. See, e.g., Manson, 432 U.S. at 114; Kennaugh, 289 F.3d at 43; Raheem, 257 F.3d at 133; Dunnigan, 137 F.3d at 128. The Court will now consider whether there was an independent basis for the suggestive identification to be nonetheless reliable.

**E.**       **Reliability**

The Supreme Court has made clear that "reliability" is "the linchpin in determining the admissibility of identification testimony." Manson, 432 U.S. at 114,  97 S. Ct. 2243, 53 L. Ed. 2d 140. Whether an identification is reliable turns on an assessment of the "totality of the circumstances." Id. In particular, the Supreme Court identified five factors in Neil v. Biggers that courts are to use in assessing the reliability of a pretrial identification. 409 U.S. at 199–200, 93 S. Ct. 375, 34 L. Ed. 2d 401. The well-established Biggers factors include: (1) a witness's opportunity to view a criminal during the crime; (2) the witness's degree of attention; (3) the accuracy of any prior description of the criminal by the witness; (4) the level of certainty demonstrated by the witness at the time of the confrontation; and (5) the length of time between the crime and the confrontation. Id.; Manson, 432 U.S. at 114;

Raheem, 257 F.3d at 135.  "A good or poor rating with respect to any one of these factors will generally not be dispositive, and in each case, the question of independent reliability must be assessed in light of the totality of the circumstances . . . ."  Raheem, 257 F.3d at 135.

### 1.    Opportunity to View and Degree of Attention

The record is unclear as to what type of opportunity the victim had to view the culprit.  The police obtained a description of the culprit from the victim in which she described him as a white male in his twenties, approximately 5'10" tall, well-built, brown hair, wearing maroon shorts and no shirt.  The record contains no other evidence indicating where the victim observed the culprit or details of exactly how the burglary occurred.  Nor does the record contain any evidence as to how long the victim viewed the culprit and from what angle.  Thus, there appears to be no available indicia of reliability that can be gathered from these two factors.

### 2.    Accuracy of Prior Description

This factor is most revealing in this case.  Apart from the maroon shorts and no shirt, the description provided by the victim was unremarkable.  However, there is one very telling description that the victim provided that does not match the Petitioner.  The Petitioner matched the description insofar as he is a white male, 5'8" tall, and "stocky."  But the Petitioner was thirty-eight years old at the time of the burglary.  All of the initial reports

stated that the perpetrator was either 18 to 20 years old or in his twenties at the time.  Also,

the Petitioner was found without a shirt like the perpetrator, but it was a hot summer day

and he apparently was wet from just having come out of the pool in the backyard.  The

other individual who was in the house with the Petitioner also matched the description,

except for his age.  He was described as about 40 years old, with brown hair, 5'10" tall, and

"pouchy."  However, the police had absolutely no suspicion that he was the perpetrator.

### 3.    Level of Certainty

The victim did not testify in the <u>Wade</u> hearing, and thus there is little direct evidence

of how certain the victim was that the Petitioner was the perpetrator of the burglary.

However, there are certain facts in which an inference can be drawn that the victim was not

so certain.  First, the victim was described as an "older woman" by the police officers.

Actually, the victim was approximately 78 years old at the time of the burglary.  Before an

identification was made, Detective McNeil was inside the house with the victim for more

than ten minutes while the Petitioner waited outside.  Immediately prior to the identification,

the Detective exited the house, handed the shorts to the Petitioner, and returned to the victim

inside the house.  At that point, while the Petitioner was nude from the waist up, holding

maroon shorts, surrounded by police, and fifteen to fifty feet away, the Detective asked the

victim if she could "recognize" anyone on the front lawn.  The Detective testified that the

victim responded "Yes," and that "this is the person that she saw leaving the house, and that

he was the same height, color hair, build, and she also identified the shorts that he was holding." The Court questions whether the victim was able to make an accurate and certain identification while being inside the house with the Petitioner at the bottom of the driveway fifteen to fifty feet away and in close proximity to three uniformed police officers and three police cars. With reasonable certainty, upon closer inspection, without the maroon shorts in front of him the victim may have come to a different conclusion.

The Court notes that the Petitioner had no opportunity to cross exam the alleged identification by the victim. The reliability of the identification solely depended on the Detective's interpretation of what the victim said. There simply was no opportunity for the Petitioner to confront the accuracy or certainty of the victim's identification.

### 4. Time Between Crime and Confrontation

The state court decisions primarily relied upon the fact that the showup was held in close temporal and geographic proximity to the crime. The first report of the burglary was received at around 11:30 a.m. The showup was conducted at approximately 12:40 p.m., ten to fifteen minutes after the police returned to the scene with the Petitioner. Thus, the showup was conducted approximately an hour and ten minutes after the commission of the crime. The amount of time that elapsed in this case has been held acceptable. See Dunnigan, 137 F.3d at 129 (three days); Vasquez, 331 F. Supp. 2d at 145 (one-and-a-half

hours). There is no concern that the victim forgot the description or that her memory had faded.

However, the other reason courts look to the temporal and geographic proximity in analyzing the reliability of a showup is not present in this case. A showup held in close proximity and time to the crime is generally found reliable because it is necessary under the circumstances to determine if the culprit is still at large and also to release a wrongly detained suspect. In addition, the presence of exigency minimizes the potential of misidentification because the unbroken chain of events—crime, escape, pursuit, apprehension, showup—negates the possibility of misidentification.

In this case, although exigent circumstances may have existed immediately after the burglary, the response of the police officers was anything but speedy. By the time Officers Holtje and Bafundo arrived at the scene and began searching the area for the culprit, more than twenty minutes had elapsed. By that time the culprit could have long fled the area. When the officers initially interviewed Brisco they testified that they did not believe he was involved in the crime. Several minutes later they developed a suspicion and returned to his location. When they escorted Brisco to the scene of the burglary, they waited almost fifteen minutes to conduct the showup. Significantly, after the alleged positive showup identification was made by the victim, Brisco was questioned at the precinct and then released. He was not arrested until three days later. That delay is subject to all kinds of interpretation and

speculation. Certainly, one would anticipate that if there was a positive identification by the victim at the scene, Brisco would have been immediately arrested. There is simply no explanation for the three day delay in arresting him. Thus, it appears to the Court that the showup identification may have been unnecessary under the circumstances. Moreover, it would have been relatively easy to quickly construct a less suggestive lineup at the police station within a short time.

### 5. Additional Factors

A sixth factor not utilized in <u>Biggers</u>, "corroborating evidence of guilt," has been recognized by another court in this District as an "[o]bjectively reasonable application of Supreme Court law." <u>See</u> <u>Vasquez</u>, 331 F. Supp. 2d at 157–58. However, the use of "corroborating evidence of guilt" in determining the reliability of a pretrial identification has been disfavored by the Second Circuit. Instead the approach has been to evaluate it only in the context of a harmless error analysis. <u>See</u> <u>Kennaugh</u>, 289 F.3d at 47. The Second Circuit noted that while "federal law in this circuit" does not mandate a sixth factor analysis, "a state-court that used a 'sixth factor' analysis would be applying the <u>Manson</u> requirements in a perfectly reasonable way." <u>Id.</u> at 47–48. <u>But</u> <u>see</u> <u>Sims v. Sullivan</u>, 867 F.2d 142, 145 (2d Cir. 1989) ("[W]here the pretrial identification procedures were proper and the other evidence of the defendant's guilt was ample, no deprivation of due process exists."). Indeed, the Supreme Court in <u>Manson</u> apparently excluded corroborating evidence of guilt

24

from the analysis of reliability in stating that "such evidence is for the jury to weigh" at trial. Manson, 432 U.S. at 116, 97 S. Ct. 2243, 53 L. Ed. 2d 140. Notwithstanding, the district court in Vasquez applied the sixth factor to the facts and determined that there was additional corroborating evidence that, when coupled with the Biggers factors, made it clear that there was no substantial likelihood of irreparable misidentification. Vasquez, 331 F. Supp. 2d at 161.

In the habeas context, the practical effect of weighing the corroborating evidence of guilt separate from the reliability analysis is that under such approach the presence or lack of corroborating evidence can only be used to save a constitutionally infirm state-court decision. The fact that a case lacks corroborating evidence cannot be used to find a state-court decision unreasonable. Indeed, this case illustrates the point. The Court has scoured the record in this case and finds little or no corroborating evidence of guilt. The possible evidence absent the identification includes the Petitioner's statement to the police, "Where is she," which was made while he waited in excess of ten minutes on the driveway at the scene of the showup. The Court notes that this statement first surfaced at the Wade hearing and was not in the Notice of Statements that the Government intended to use at trial, even though other statements were included, such as "those are my shorts." In addition, the statement is only useful if one assumes that the Detective never mentioned that the victim of the burglary was a women when he asked the Petitioner to go with him to the scene. The

only other evidence is the fact that the Petitioner owned a pair of maroon shorts that fit the description of the culprit.  However, notwithstanding the above comments, Supreme Court precedent and the terms of § 2254 afford no significance to the lack of corroborating evidence with regard to the constitutionality of a showup.  The Court is bound by these constraints.

A careful review of the record invariably leads to the question of why the police singled out the Petitioner.  The officers testified that they approached the house because the front door was ajar and it appeared to be under renovation.  The house was actually under renovation, and although the first front door was open, there was another door a few feet inside that was closed.  Upon questioning, the Petitioner appeared calm and stated that he was renovating his sister's bathroom with his friend and had been in the house all morning.  In fact, the bathroom was being renovated and his friend was covered with construction dust.  The Petitioner appeared wet, as if he had just taken a shower or a swim.  All of these responses and circumstances appear to be reasonable and give rise to no suspicion.  After the police initially questioned the Petitioner they left the house, apparently satisfied that he was not the perpetrator.  A few minutes later, Officer Holtje spoke with the Detective and stated that "it seemed suspicious to me that he answered the door wearing only a towel."  Tr. at 14.  In this regard, the Court notes that there was a pool in the backyard and it was a hot summer day in July.

In addition, all the descriptions by the police indicate that the Petitioner was cooperative throughout the whole process. He answered every question asked by the police; he invited the police into the house; he went to the scene voluntarily; he waited up to fifteen minutes in front of the house; he held the shorts as asked by the Detective. After the showup, the Petitioner was released and a felony complaint was not filed until three days later. However, as noted above, under the clearly established Federal law, as determined by the Supreme Court and specifically applied in <u>Manson</u>, all of these additional facts do not enter into an analysis of the reliability of the showup.

Even without considering the striking lack of corroborating evidence, the Court finds that the identification is not independently reliable enough to outweigh "the corrupting effect of the suggestive identification itself." <u>Brathwaite</u>, 432 U.S. at 114, 97 S. Ct. 2243. Indeed, the only factor noted above that weighs in favor of reliability is the time between the crime and the showup. All other indicators render it suspect under the due process clause. First, the defendant was asked to hold an item identified with the suspect of the crime and was nude from the waist up. Second, the Petitioner was surrounded by uniformed police officers as if he was in custody. Third, the Petitioner is almost twenty years older than the descriptions of the perpetrator. Fourth, the 78 year old victim was asked to identify the suspect from the window of her house while he stood approximately fifteen to fifty feet away at the foot of the driveway. Fifth, the victim did not testify as to the alleged identification.

Sixth, the Petitioner was not arrested until three days after the positive identification. Finally, there were no circumstances that made the use of a showup necessary. Accordingly, the Court finds that the showup was highly suggestive, and unreliable.

### F.     Application of the AEDPA Standards

As discussed above in the first prong, the AEDPA directs a federal court to confine its habeas review of a state court decision to whether that decision: (1) is contrary to clearly established Federal law; or (2) involved an unreasonable application of clearly established Federal law. 28 U.S.C. § 2254(d)(1). The New York Court of Appeals found that:

> [the] record evidence supports the conclusion that the procedures used were reasonable under the circumstances. The showup took place at the scene of the crime, within an hour of the commission of the crime, and in the context of a continuous, ongoing investigation. Record evidence also supports the conclusion that the showup identification was not unduly suggestive. The victim stated that defendant was the person whom she had seen leaving her house, and initially and independently identified him relying on his height, hair color, and build. In these circumstances, the presence of defendant's maroon shorts, admittedly his own, did not, as a matter of law, negate the reasonableness of the police action.

Brisco, 99 N.Y.2d at 597, 788 N.E.2d 611, 758 N.Y.S.2d 262 (footnote omitted).

The Court finds that the decisions of the New York courts are certainly not "contrary to Federal law." The New York Court of Appeals identified the federal standard, as annunciated in Manson, Biggers, and Stovall, when it stated that a showup is admissible if it "was reasonable under the circumstances . . . and the procedure used was not unduly

suggestive." Id. The court appeared to apply some of the Biggers factors in making its determination that the showup was reasonable and that such reasonableness outweighed any suggestiveness that may have occurred by the holding of the shorts. Id.

However, in this Court's view, the New York courts did not reasonably apply the facts of the case to the two-step inquiry set forth in Manson. The state courts first determined that the police action was reliable because "it took place at the scene of the crime, within an hour of the commission of the crime, and in the context of a continuous, ongoing investigation." Id. Second, the state courts reasoned that the suggestive "presence of the maroon shorts" did not "negate the reasonableness of the police action." Id. But when analyzed in the order set forth in Manson, it becomes apparent that the state courts did not consider the "totality of the circumstances." Instead the state courts erred by placing too great of a reliance on the fact that the showup was held in close geographic and temporal proximity, without analyzing the other circumstances present.

The need to conduct a showup is a factor that lends reliability to a suggestive identification. For instance, the presence of exigency minimizes the potential of misidentification. Whether exigent circumstances are present can be inferred by a continuous chain of events. Here, the investigation was not continuous. The officers did not begin to search for the culprit in the neighborhood until more than twenty minutes had elapsed. In addition, the officers left the Petitioner after they initially questioned him.

Moreover, the Petitioner was released after a positive identification was made at the showup. These factors call into question the need to conduct a prompt showup at the scene, rather than a lineup at the precinct. Considering there was no need to conduct the showup, in this case the mere fact that the showup was conducted in close temporal and geographic proximity does not cure the suggestiveness of the police action.

In keeping within the less than clearly defined standard of "unreasonable application" the Court is not empowered to grant the writ based on a mere incorrect application of the relevant federal law. "The state court's application must reflect some additional increment of incorrectness such that it may be said to be unreasonable." Lainfiesta, 253 F.3d at 155. "[A]n 'objectively unreasonable' application of Supreme Court precedent falls somewhere between 'merely erroneous and unreasonable to all reasonable jurists.' " Henry, 409 F.3d at 68 (quoting Francis S. v. Stone, 221 F.3d 100, 109 (2d Cir. 2000)).

This case has the kinds of "additional increments of incorrectness" that push a decision beyond the pale of being "merely erroneous." In addition to the highly suggestive nature of the showup—which the state courts erroneously found "not unduly suggestive"—the assessment of reliability was incorrect on several levels. The state courts apparently did not consider the fact that the Petitioner was almost twenty years older than the description of the perpetrator given by the victim. Also, the state courts did not scrutinize the victim's ability to identify a suspect from the front window of her house while

he was between fifteen and fifty feet away. There also is no indication of how the victim viewed the perpetrator, for how long she first viewed him, and from what angle. In fact, there was no testimony from the victim herself as to the identification, and no opportunity for the Petitioner to confront the credibility of the alleged positive identification. Further, the fact that Brisco was released after the alleged positive identification indicates that the police did not find the showup reliable enough to justify probably cause to immediately arrest him at the time.

Under these circumstances, it was unreasonable to rely on the length of time between the crime and the identification and the maroon shorts to determine the reliability of the showup. Obviously such analysis did not reasonably consider the "totality of the circumstances," including the substantial disparity in age calculation; the forced holding of the maroon shorts; the identification made through a window from fifteen to fifty feet away while in the company of three uniformed police officers and marked and unmarked police vehicles; and the release of the Petitioner after the showup. The Due Process Clause of the Constitution requires consideration of all these factors so that "trials proceed consistently with that fundamental fairness which is essential to the very concept of justice." Raheem, 257 F.3d at 133.

The Court concludes that the state-court's admission of the pretrial "showup" identification was an unreasonable application of clearly established Federal law as decided

by the Supreme Court.  Accordingly, Brisco's petition for a writ of habeas corpus is hereby granted.

### III.    CONCLUSION

For the reasons stated above, it is hereby

**ORDERED,** that the petition for a writ of habeas corpus is conditionally **GRANTED** as set forth below; and it is further

**ORDERED**, that the State vacate the Petitioner's plea of guilty; and it is further

**ORDERED,** that the Petitioner be released from the Respondent's custody unless appropriate steps are taken for a trial within 90 days of the date of this Order; and it is further

**ORDERED,** that at the trial the pretrial showup identification shall be suppressed; and it is further

**ORDERED,** that this Order is stayed pending the conclusion of any appeal as to this ruling; and it is further

**ORDERED**, that service of this Order shall be made by the Clerk of the Court by mailing, by certified mail, a copy thereof to the District Attorney of Suffolk County, 200 Center Drive, Riverhead, New York 11901 and to the Petitioner; and it is further

**ORDERED**, that the Clerk of the Court is directed to close this case.

**SO ORDERED.**

Dated: Central Islip, New York
July 16, 2005

_____/s/____Arthur D. Spatt_____
ARTHUR D. SPATT
United States District Judge